**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Mary McPherson, | : | Case No. 3:07 CV 3328 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). Pending are the parties' Briefs on the merits (Docket Nos. 21, 24 and 27). For the reasons set forth below, the Commissioner's decision is affirmed.

**PROCEDURAL BACKGROUND**

On May 18, 2003, Plaintiff filed an application for DIB alleging that she became unable to work because of her disabling condition on October 14, 2000 (Tr. 66-68). Her application was denied initially and upon reconsideration (Tr. 53-56, 61-63). Upon denial of her application at the agency level, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). On September 15, 2005, ALJ Bryan Bernstein conducted an administrative hearing, at which Plaintiff and Vocational Expert (VE) Edwin

Yates, appeared and testified.  On October 12, 2006, the ALJ rendered an unfavorable decision denying Plaintiff's claim (Tr. 17-27).  Upon denial of review by the Appeals Council, the ALJ's decision was affirmed rendering it the final decision of the Commissioner (Tr. 6-8).  Plaintiff then filed a timely action in this Court seeking judicial review of the Commissioner's final decision.

## JURISDICTION

This Court exercises jurisdiction over the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony*

Plaintiff lived with her seventeen-year-old son, and their living expenses were subsidized by Plaintiff's boyfriend (Tr. 518).  Her son cooked, swept the floors and shopped for groceries (Tr. 518, 519).

Plaintiff stopped working as a receiving/lay-a-way clerk in October or November 2000 because she could not stand, she could not deal with people and she had shoulder pain.  She was paid income derived from sick leave in 2001 (Tr. 510, 511, 512).  Subsequently Plaintiff attempted to return to work in 2002 (Tr. 511).  She was employed as a machine operator (Tr. 513).  She left this job because she had debilitating foot pain which impeded her ability to lift or stand (Tr. 513, 514).

Plaintiff underwent an unsuccessful tendon surgery (Tr. 514).  Despite the surgery, Plaintiff's foot pain persisted.  The pain was severe in the morning but tapered off during the day.  The bottom of her feet burned (Tr. 514).  Apparently, when seated the pain subsided (Tr. 515).  Plaintiff opined that the shoulder surgery resulted in neurological deficits in her fingers and leg (Tr. 522, 523).  She could not lift

2

her arm over her head and she had difficulty manipulating, grabbing or holding with her right hand (Tr. 523). She had paresthesia in her leg resulting from a pinched nerve (Tr. 523).

Plaintiff recalled that she did not leave her home for four months. During that time, there were days that she did not get out of bed (Tr. 519-520). Plaintiff also claimed that she suffered from paranoia and she engaged in uncontrolled, compulsive behaviors (Tr. 521, 522). Uncertain of what medication had been prescribed, Plaintiff assumed that she was taking a mood-stabilizer, anti-inflammation, antiepileptic and antidepressant drugs (Tr. 515, 516). She also had undergone therapy (Tr. 521). She was certain that she had two inhalers to relieve breathing problems (Tr. 524, 525). Car fumes affected her ability to breath "real bad" (Tr. 524).

Plaintiff explained that she had no difficulty sitting (Tr. 523). She could lift a gallon of milk with difficulty (Tr. 524). Plaintiff did not drive as she "got too nervous" (Tr. 517). She took the bus twice monthly to visit her doctor (Tr. 518).

*Vocational Expert Testimony*

The VE testified that since Plaintiff was unable to perform work that imposed: (1) a closely regimented pace of production, (2) limitations of pushing, pulling, reaching or lifting with the right arm, (3) an ability to lift ten pounds and carry ten pounds with the right arm alone, (4) the ability to engage in sustained sitting and standing and take frequent breaks, and (5) the ability to lift ten pounds frequently and twenty pounds occasionally using both arms, she could not return to her past relevant work (Tr. 527). She could, however, obtain work as one of 75 testers, one of 400 ampoule sealers or as one of the 500 type copy examiners in the local economy. These jobs, all found in the Dictionary of Occupational Titles (DOT), represent a sample of sedentary unskilled work available in Northwest Ohio (Tr. 527). Light work would be excluded because of the need for significant breaks (Tr. 528).

These jobs were generally performed in a fairly clean environment. The copy examiner would be exposed to some dust and fumes emanating from a laser toner. The ampoule sealer was commonly found in an antiseptic pharmaceutical environment (Tr. 529). The type copy examiner's job required an ability to hold a marking utensil (Tr. 530).

## MEDICAL EVIDENCE

**1.    Associated Eye Care (Tr. 198).**

Plaintiff was examined on May 2, 2002, to determine the etiology of her headaches. Dr. Carol J. German determined that Plaintiff had a myopic astigmatism in the left eye, her pressures were within normal range and her dilated fundus examination was completely within normal limits. A prescription for vision correction was issued (Tr. 198).

**2.    Dr. David J. Forsythe (Tr. 240-243).**

State consultant Dr. Forsythe examined Plaintiff on August 18, 2003, thereafter diagnosing her with moderate obsessive compulsive disorder (OCD), dysthymic disorder, asthma, and moderate symptoms or moderate difficulty in social, occupational, or school functioning. Her prognosis was poor without psychiatric treatment (Tr. 243).

**3    Mental Residual Functional Capacity Assessment (Tr. 182-185; 257-259).**

Two medical sources conducted mental residual functional capacity assessments.

**A.** Dr. Catherine A. Flynn, Ph. D., concluded on April 25, 2001, that Plaintiff's intellect was within a normal range and she had a mood disturbance disorder (Tr. 184). There were no marked limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation resulting from her impairments (Tr. 182-183).

**B.** Dr. Alice L. Chambly, Psy. D., noted that Plaintiff was of average intelligence, extremely

4

obsessed with germs and able to perform simple tasks (Tr. 259). There were only moderate limitations in Plaintiff's ability to understand and remember, carry out detailed instructions or maintain attention for extended periods of time, interact appropriately with the general public or respond appropriately to changes in the work setting (Tr. 257-258).

4.      **Mercy Health Partners (Tr. 360).**

Plaintiff was diagnosed with recurrent dislocation of the shoulder region, asthma and tobacco use disorder on April 1, 2004 (Tr. 360).

5.      **Dr. Arunkumar Patel (Tr. 373; 381-382; 387; 390; 398-402;411; 416; 422; 425; 426; 445).**

In April 2004, Dr. Patel authorized Plaintiff's admission into the hospital for treatment of increasing symptoms of depression, suicidal ideations, agitation and mood swings (Tr. 445). On June 24, August 19, and October 14, 2004, Dr. Patel prescribed medication for treatment of depression (Tr. 382, 390, 399-400). In the interim, a licensed social work rendered supportive psychotherapy (Tr. 374-380; 382-386; 388-389; 391-397;403-405).

On February 3, 2005, Plaintiff was assessed for admission into the hospital because she was not sure of herself and suicidal at times (Tr. 373). Upon admission, Dr. Patel diagnosed her with bipolar disorder (Tr. 447). When admitted in April, Dr. Patel diagnosed Plaintiff with a schizophrenic disorder and recurrent depression (Tr. 449-453). On June 30, 2005, Plaintiff reported to Dr. Patel that she was decreasing her medication because her level of agitation had been diminished and her mood was stable (Tr. 411).

6.      **Physical Residual Functional Capacity Assessment (Tr. 235-238).**

On August 14, 2003, Dr. Jerry G. Lispasic found that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an

5

eight-hour workday, sit about six hours in an eight-hour workday and push and/or pull limited in the upper extremities (Tr. 236). There were no manipulative, visual or communicative limitations (Tr.237 238). Dr. Lispasic recommended that Plaintiff avoid all exposure to hazards (Tr. 238).

**7.     Psychiatric Review Technique Forms (Tr. 168-181; 244-256).**

Two medical sources conducted psychiatric reviews.

**A.**  Dr. Flynn opined on April 25, 2001 that Plaintiff suffered from disturbance of mood characterized by sleep disturbance, decreased energy and feelings of guilt. Present also were major depression, single episode, severe psychoses, an anxiety-related disorder and a personality disorder (Tr. 171, 173, 175). Plaintiff had mild to moderate limitations in her restrictions of activities of daily living, difficulty in maintaining social functioning and maintaining concentration, persistence or pace (Tr. 178).

**B.** On August 25, 2003, Dr. Chambly, diagnosed Plaintiff with a dysthymic and OBCs (Tr. 247, 251). In her opinion, Plaintiff had only mild to moderate degrees of limitation in the restriction of activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (Tr. 254).

**8.     St. Anne Mercy Medical Center (Tr. 361-366).**

On March 31, 2004, Plaintiff underwent an arthroplasty to stabilize her right shoulder (Tr. 363). Plaintiff was diagnosed with right shoulder pain, a history of asthma, gastroesophageal reflux disease and depression/anxiety on April 1, 2004 (Tr. 361).

**9.     St. Charles Mercy Hospital (Tr. 276-312; 315-340; 368-369; 371).**

Plaintiff was treated for acute bronchitis on November 18, 1999, with drug therapy (Tr. 311).

Plaintiff was assessed for admission by the Rescue Crisis Mental Health Services (RCMHS) on May 10, 2000 (Tr. 302-310). She did not qualify for admission (Tr. 302). Later in November, Plaintiff

was admitted to RCMHS for treatment of major depression, single episode. She was hospitalized for approximately nine days during which her medication was changed and the dosage increased. Efforts were made to identify and overcome Plaintiff's fears and her problems related to hopelessness and helplessness (Tr. 299). Her physical examination showed evidence of trace amounts of mitral regurgitation (Tr. 327) and her white blood count was elevated (Tr. 328).

Plaintiff had a heel spur excised from her right foot on December 8, 2000 (Tr. 296-297). On December 10, 2000, Plaintiff fell and was treated for right foot pain with a pain reliever (Tr. 293). Several projections of the foot, however, showed no evidence of fracture, dislocation, bony destruction process or other significant bony abnormality (Tr. 294). Later on December 30, 2000, Plaintiff was treated for abdominal, back, rib and neck pain (Tr. 284-285). The computed tomographic (CT) scan of her abdomen and pelvis were normal (Tr. 287). Her white and red blood cell counts were slightly higher than normal (Tr. 289).

Plaintiff was prescribed a pain reliever for arm/shoulder and head injuries sustained on or about August 22, 2001 (Tr. 277-281). X-rays of her cervical spine, lateral chest and mandible were normal (Tr. 282).

Plaintiff was treated for a "productive cough" which lasted from October 17, 2003 through October 27, 2003 (Tr. 276).

The results of the magnetic resonance imaging (MRI) tests administered on May 5, 2004, showed some change to the joint and ligament of the right shoulder. The results of the MRI of the lumbar spine were unremarkable (Tr. 368). Plaintiff was prescribed a pain reliever starter pak to address the right shoulder pain in June 2004 (Tr. 371).

**10.      St. Vincent Mercy Medical Center (Tr. 234).**

Radiographic images of Plaintiff's right foot were unremarkable on August 6, 2003 (Tr. 234).

**11.      Dr. Usha Salvi**

After the initial psychiatric evaluation conducted on December 22, 2000, Dr. Salvi diagnosed Plaintiff with panic disorder with agoraphobia, major depressive disorder and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 221). On November 26, 2002, during an updated psychiatric evaluation, Dr. Salvi diagnosed Plaintiff with major depressive disorder, anxiety disorder and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 215). In the interim, Dr. Salvi monitored her consumption of medications prescribed primarily to treat major depression (Tr. 209-212). After updating the evaluation, Dr. Salvi focused on controlling symptoms of anxiety such as anger and impulses with medication (Tr. 204-208).

**12.      Dr. Kathryn Schramm, Doctor of Podiatric Medicine (DPM) (Tr. 189-195)**.

X-rays taken on April 3, 2001, showed no bony abnormalities. Plaintiff related severe pain with any standing on her right heel and arch (Tr. 189). Plaintiff walked with a limp in her right foot. Dr. Schramm noted that since February 12, 1999, Plaintiff had used an orthotic to help alleviate the pain when walking (Tr. 190). She further opined that Plaintiff could open a jar, button her clothes, write legibly, pick up small objects, hold a pencil and use a small keyboard (Tr. 192). During the course of treatment, Dr. Schramm had prescribed Motrin to relieve pain (Tr. 193).

**13.      Dr. Don E. Stathulis, DPM (Tr. 200-201)**

Plaintiff underwent surgery to excise a heel spur on December 8, 2000. She was released to work on February 2, 2001 (Tr. 200-201). Dr. Stathulis did not address issues related to her left foot pain (Tr. 201).

**14.     Dr. Farzana N. Tausif (Tr. 260-274;342-352)**.

From April 18, 2002, through September 16, 2003, Dr. Tausif primarily resolved symptoms of bronchitis (Tr. 273-274), and prescribed and monitored her consumption of an antidepressant (Tr. 266-267, 269-271).  In addition, Dr. Tausif prescribed pain killers and antibiotics for toothaches on July 2, 2002 and May 1, 2003, and a lump under her chin on September 16, 2003 (Tr. 261, 263, 268), administered a unidose of medication to expand the airways on November 8, 2002 (Tr. 266), and prescribed pain relievers for treatment of right shoulder and left foot pain on November 27, December 9, 2002 and May 15, 2003 (Tr. 262, 264, 265).

Dr. Tausif administered an aerosol treatment on July 15 and again on October 22, 2003, to improve the air exchange in Plaintiff's lungs (Tr. 346, 347).  By late October, Plaintiff's bronchitis and laryngitis had improved (Tr. 345).  The results from the pelvic echogram administered on November 21, 2003 were normal (Tr. 349).  In December, Dr. Tausif noted that Plaintiff's pelvic ultrasound and mammogram were unremarkable (Tr. 343).

Dr. Tausif prescribed a pain reliever for persistent right shoulder pain on March 5, 2004 (Tr. 342).

**15.     Dr. Rekha R. Trivedi (Tr. 228-233).**

During a manual muscle examination, Dr. Trivedi found that Plaintiff could raise her shoulder abductors and rotators against gravity only.  The range of motion in her shoulders, ankles and dorsolumbar spine was decreased (Tr. 231, 232).

**16.     Dr. Michael Walkovich, DPM (Tr. 313; 489-492)**

On October 31, 2003, Dr. Walkovich applied a low-dye strap to Plaintiff's left foot and a compression wrap to her right midfoot.  He gave Plaintiff instructions for stretching exercises and prescribed a pain reliever (Tr. 313).  Plaintiff was casted for orthotics on November 14, 2003 (Tr. 491).

The orthotics were dispensed in December and in February, Plaintiff was fitted for a night splint and prescribed a pain reliever for continued pain in her left heel (Tr. 490). Dr. Young administered a nerve block on March 5, 2004 to relieve pain in the left heel and right second metatarsal (Tr. 489).

17.     **Woodville Road Health Center (Tr. 353-359).**

A flow chart of Plaintiff's vital statistics, chronic diagnoses, chronic medications and hospitalizations was maintained from October 9, 2001 through March 15, 2003 (Tr. 353-359). The history of Plaintiff's medical problems included, *inter alia*, irregular periods, pelvic and shoulder pain (Tr. 356, 357), depression and chronic bronchitis (Tr. 357, 358)

18.     **Dr. Mark Young (Tr. 461; 476-488).**

All three views of Plaintiffs shoulder, taken post fall on February 21, 2005, showed no acute fracture, dislocation or bony destructive process (Tr. 484). There was, however, a fracture noted in the 5th toe (Tr. 485). X-rays of Plaintiff's lumbar spine that were ordered by Dr. Young on April 7, 2005, showed normal results (Tr. 461). Dr. Young prescribed refills for Plaintiff's asthma inhaler and diskus (Tr. 478). On May 27, 2005, Dr. Young treated Plaintiff's low back pain with drug therapy (Tr. 477). Blood specimens collected on May 25, 2005, showed a differential in the measure of white blood cells that was higher than the normal reference range (Tr. 480, 482). The results of the nerve conduction study conducted on June 7, 2005, showed no evidence of a lumbosacral radiculopathy (Tr. 487). Dr. Young treated Plaintiff's right thigh pain with drug therapy on June 24, 2005(Tr. 476).

## STANDARD OF DISABILITY

A claimant can receive benefits only if he or she is deemed disabled under the Act. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (Thomson Reuters/West 2008). The Act defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (Thomson Reuters/West 2008). In applying this standard, the Commissioner has promulgated regulations setting forth a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 (Thomson Reuters/West 2008).

The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, he or she is not disabled.
2. If claimant is not doing substantial gainful activity, his or her impairment must be severe before he or she can be found to be disabled.
3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his or her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
4. If claimant's impairment does not prevent him from doing his or her past relevant work, he or she is not disabled.
5. Even if claimant's impairment does prevent him or her from doing his or her past relevant work, if other work exists in the national economy that accommodates his or her residual functional capacity and vocational factors (age, education, skills, etc.), he or she is not disabled.

*Ridge v. Barnhart* 232 F. Supp. 2d 775, 785 -786 (N. D. Ohio 2002) (*citing Lyons v. Social Security Administration,* 19 Fed. Appx. 294, 2001 WL 1110110, *5 (6th Cir. 2001), unpublished (*citing Walters v. Commissioner of Social Security,* 127 F.3d 525, 529 (6th Cir. 1997), *and* 20 C.F.R. § 404.1520(b)-(f)). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Id.* (*citing Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990)).

## **THE ALJ'S FINDINGS**

After careful consideration of the entire record, the ALJ Bernstein made the following findings of fact:

1. Plaintiff met the non-disability requirements for a period of disability and was insured through March 31, 2007.

2. Plaintiff had severe impairments including plantar fascitis, right shoulder pain, asthma, depression and anxiety. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3. Plaintiff was not reliable.

4. After careful consideration of the entire record, it was determined that the claimant had the residual functional capacity to perform a restricted range of work activity.

5. Plaintiff was unable to perform any past relevant work.

6. Plaintiff, a younger individual with at least a high school education, has the ability to communicate in English and the residual functional capacity for sedentary work, could perform jobs that existed in significant numbers in the national economy.

7. Plaintiff was not under a disability as defined in the Act at any time through this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(Tr. 19-27)

## **STANDARD OF REVIEW**

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. *Id*. The court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* (*citing* 42 U.S.C. § 405(g)). Accordingly, the court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990)).

The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's

conclusion. *Id.* (*citing Walters, supra*, 127 F.3d at 528). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.* (*citing Walters,* supra, 127 F.3d at 532). Substantiality is based upon the record taken as a whole. *Id.* (*citing Houston v. Secretary of Health and Human Services,* 736 F.2d 365 (6th Cir. 1984)).

## DISCUSSION

Initially, Plaintiff contends that the ALJ's finding of residual functional capacity does not bear a close relationship to any medical evidence in the file. Next, Plaintiff argues that the ALJ failed to apply the full test for evaluating subjective complaints, thus, this Court need not give deference to his credibility finding that she is "not reliable."

In her Response, Plaintiff claims that Dr. Chambly's moderate limitations are not discussed in the body of the ALJ's decision. Moreover, the Commissioner erroneously relied on the Social Security Program Operations Manual System (POMS).

**1.     RFC Assessment**

Plaintiff claims that in assessing residual functional capacity, the ALJ failed to accurately assess the state agency psychologists. Simply the ALJ failed to follow the procedural rules for considering the findings of fact by state agency medical or psychological consultants, Drs. Chambly and Forsythe, as promulgated under Social Security Ruling (SSR) 96-6p or 20 C. F. R. § 404.1527(d), (f).

The opinions of state agency medical and psychological consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Councils levels that was not before the state agency, the consistency of the opinion

with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist. SSR 96-6p, 1996 WL 374180 at *2. The adjudicator must also consider all other facts that could have a bearing on the weight to which an opinion is entitled, including any specialization of the state agency medical or psychological consultant. SSR 96-6p, 1996 WL 374180 at *2.

The ALJ's decision contains a concise discussion of the regulatory factors applicable to weighing the medical opinions of state agency consultants. He cites specifically to his consideration of 20 C. F. R. § 404.1527 and SSR 96-6p (Tr. 22). Then the ALJ applied the correct legal criteria to evaluate these medical source opinions by providing an explanation for the opinion, espousing how the reports of Drs. Crowley and Forsythe are supported by the evidence and how they are consistent with each other. Finally the ALJ reiterated that Dr. Forsythe's specialization was psychiatry (Tr. 24). The ALJ obviously adopted the restricted range of work activity imposed by both physicians, giving such opinions controlling weight as he imposed such limitations in residual functional capacity finding. Since the ALJ has evaluated the state agency physicians opinions under the legal criteria mandated by the Regulations, Plaintiff's challenges to the ALJ decision do not warrant reconsideration by the Commissioner.

**2.     Credibility**

Plaintiff takes issue with the ALJ's suggestion that her crying episodes were contrived to avoid providing accurate details of her condition and that she somehow exaggerated her subjective complaints for secondary gain. Such finding avoids evaluating her symptoms, including pain, under 20 C. F. R. § 404.1529 or SSR 96-7.

In general, the Commissioner will consider all of the claimant's symptoms, including pain, and the extent to which the claimant's symptoms can reasonably be accepted as consistent with the medical

signs and laboratory finding as well as other evidence. 20 C. F. R. § 404.1529(a) (Thomson Reuters/West 2008); SSR 96-7p at *2. The claimant's symptoms will not be found to affect his or her ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present. 20 C. F. R. § 404.1529(b) (Thomson Reuters/West 2008); SSR 96-7p at * 2.

When the medical signs or laboratory findings show that the claimant has a medically determinable impairment(s) that could reasonably be expected to produce the claimant's symptoms, such as pain, the Commissioner must then evaluate the intensity and persistence of the claimant's symptoms to determine how these symptoms limit the claimant's capacity for work. 20 C. F. R. § 404.1529(c)(1) (Thomson Reuters/ West 2008); SSR 96-7p at *2. Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the Commissioner will carefully consider any other information the claimant may submit about his or her symptoms. 20 C. F. R. § 404.1529 (c)(3) (Thomson Reuters/West 2008); SSR 96-7p at * 1.

The Magistrate agrees that the ALJ's characterization of Plaintiff's testimony as "fragile in the context of secondary gain" is not probative of Plaintiff's credibility. However, the ALJ's comments on Plaintiff's demeanor are crucial to the resolution of Plaintiff's claim. In the Sixth Circuit, the ALJ's opportunity to observe the demeanor of the claimant is invaluable and should not be lightly discarded. *Villarreal v. Secretary of Health and Human Services,* 818 F. 2d 461, 463 (6th Cir. 1987).

The ALJ cited evidence other than his personal observations to reject Plaintiff's credibility. He considered whether there was an underlying medically determinable physical or mental impairment that could be expected to produce the symptoms of which Plaintiff complained. In arriving at this decision the ALJ analyzed, in detail, Plaintiff's statements regarding her pain and other symptoms, her demeanor

during the hearing and the inconsistency of her statements with the clinical and laboratory diagnostic tests (Tr. 20-21). He further considered the intensity, persistence and functionally limiting effects of Plaintiff's symptoms, her daily activities, factors that precipitate her pain, the medication consumed and other treatment, including surgery (Tr. 21).

The Magistrate cannot find that based on the evidence essential to judicial review, the ALJ failed to follow the Regulations in assessing credibility.

**3.     Miscellaneous Errors**

In her Response to the Defendant's Answer, Plaintiff argues that at step four of the decision making process, the ALJ failed to articulate a reason for rejecting her moderate limitations addressed by Dr. Chambly in the Mental Residual Functional Capacity Assessment (Tr. 257-259).

When the ALJ determines, as he did here, that the claimant suffers from a severe mental impairment that does not meet a listing, the ALJ must perform a mental residual functional capacity assessment or determine the most the claimant can still do despite her mental and physical limitations. 20 C.F.R. §§ 404.1520a(d)(3) and 404.1545(a)(1) (Thomson Reuters/West 2008). When assessing the claimant's mental abilities, the ALJ will first assess the nature and extent of the claimant's mental limitations and restrictions and then determine residual functional capacity for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(c) (Thomson Reuters/West 2008). The mental residual functional capacity assessment augments the listings determination by requiring consideration of an expanded list of work-related capacities, specifically, considering the ability to (1) understand, remember and carry out simple instructions; (2) respond appropriately to supervision, co-workers and customary work pressures in a work setting; and (3) deal with work pressures in work settings. 20 C.F.R. § 404.1545(c) (Thomson Reuters/West 2008).

Dr. Chambly found in her functional capacity assessment that Plaintiff had "moderate" limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workweek without interruption, interact appropriately with the public, accept instructions and respond appropriately, respond to changes in the work setting and set realistic goals (Tr. 257, 258). Dr. Chambly noted in more conclusory terms that Plaintiff maintains the ability to perform simple and routine tasks. Based on Dr. Chambly's function-by-function assessment, the ALJ formulated Plaintiff's mental residual functional. He concluded that Plaintiff's depression caused deficits in her understanding, sustained concentration and persistence, social interaction and adaptation. The ALJ incorporated these terms in the limitations to performance of a restricted range of work activity involving only routine, repetitive tasks. He further suggested that Plaintiff would require the standard three breaks during the day, that she sustain walking if allowed to rest briefly, refrain from work that imposed a closely regimented pace of production, close supervision or intense contact with the public or strangers (Tr. 25). The ALJ's written decision incorporated the pertinent findings made by Dr. Chambly based on the mental technique evaluation. Plaintiff's claim that he failed to articulate legitimate reasons for rejecting moderate limitations is accurate. The ALJ did not expound on rejecting the limitations because he incorporated Dr. Chambly's moderate limitations in assessing Plaintiff's residual functional capacity.

Finally, Plaintiff suggests that Defendant incorrectly relied on the use of POMs in assessing the degree of limitations. Although the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law, it is nevertheless persuasive. *Davis v. Secretary of Health and Human Services* 867 F.2d 336, 340 (6th Cir. 1989) (*citing Evelyn v. Schweiker,* 685 F.2d 351 (9th Cir. 1982)). The POMS

17

explains the meaning of the Act as well as the meaning intended by terms appearing within the regulations.  *Id.* (*citing Powderly v. Schweiker,* 704 F.2d 1092 (9th Cir. 1983)).

Clearly, POMS may be consulted in evaluating social security claims.  In this case, there is no indication that when evaluating Plaintiff's claims, the ALJ relied on the procedural dictates of POMS.  However, if he did rely on POMS in applying the procedures, there is no evidence that reliance on POMS resulted in an erroneous assessment of Plaintiff's physical capacity.

## **CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is affirmed and the case is dismissed.  So ordered.

/s/ Vernelis K. Armstrong  
United States Magistrate Judge

Date:   February 12, 2009